## IN THE UNITED STATE DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## BECKLEY DIVISION

**G.M. MCCROSSIN, INC.,**                      CIVIL ACTION NO.  5:17-cv-03953

        **Plaintiff,**

    **v.**

**CITY OF RONCEVERTE, WEST
VIRGINIA,**

        **Defendant.**

## COMPLAINT

Plaintiff G.M. McCrossin, Inc., by and through its attorneys, Babst, Calland, Clements and Zomnir, P.C., states the following for its Complaint against Defendant, the City of Ronceverte, West Virginia:

## THE PARTIES

1.      Plaintiff G.M. McCrossin, Inc. ("GMM"), is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania having its principal place of business at 2780 Benner Pike, Bellefonte, Pennsylvania 16823.

2.      Defendant City of Ronceverte, West Virginia, (the "Owner") is an incorporated municipality with its principal address and/or place of business at 200 W. Main Street Ronceverte, West Virginia 24970.

## JURISDICTION AND VENUE

3.      There is diversity of citizenship between the Plaintiff and the Defendant, and the matter in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs; therefore, this Court has jurisdiction by virtue of 28 U.S.C. § 1332.

4.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) in that Defendant is resident in this District and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTS COMMON TO ALL COUNTS

5.      At some point no later than 2011, the Owner began to consider making improvements to its waste water treatment facility (the "Facility") and retained Dunn Engineers, Inc. ("Dunn"), to provide professional services in connection with that potential project.

6.      In or around 2014, the Owner determined to solicit competitive bids to construct and/or effect modifications to the existing waste water treatment facility (the "Project").

7.      The Facility is located along the banks of the Greenbrier River in Ronceverte, West Virginia.

8.      The Owner retained Dunn as the Project design professional to prepare, *inter alia*, Plans, Detail Specifications, General and Supplementary Conditions, Addendums, and Invitations for Bids and to perform related professional services necessary to the design, bidding, and construction of the Project. These documents are sometimes referred to collectively herein as the "Project Documents."

9.      Following a re-bid, GMM was the low bidder, and the Owner awarded a contract to GMM for the Project based on a price of Nineteen Million Six Hundred Seventy Eight Thousand Eight Hundred Ten Dollars ($19,678,810.00), calculated on the basis of unit prices as set forth in the Project Documents and GMM's Proposal.

10.     The Contract contains an effective date of August 18, 2015.  The base Contract is attached as Exhibit A.  Not all documents compromising part of the Contract are attached as they are voluminous and are already in the possession of the Owner.

11.     Dunn is the Owner's representative on the Project holding express and apparent authority to represent the interests of the Owner with respect to the Contract Documents and with respect to making decisions regarding the work of the Project.

12.     As part of the Owner's investigation and analysis of the potential improvements to the Facility, Dunn retained American Geotech, Inc. ("AGI") in 2011 to provide subsurface exploration and geotechnical analysis of the area proposed for the improvements, and AGI issued certain findings and opinions following its investigation.

13.     In general, Dunn accepted the findings of AGI and designed the Project to require use of a three inch (3") mud mat under foundation areas.  In addition, Dunn's design required that structure foundations be placed on ground with a net soil bearing capacity of 2,000 pounds per square foot.

14.     While the Contract did not establish the exact sequence of construction, it required that GMM submit and receive approval from Dunn for a detailed Project Schedule showing the sequence of construction that included beginning and end dates for various components of the Project, including the "Headworks Building" and the "Vertical Loop Reactor."

15.     As required, GMM prepared a proposed Schedule that reflected all of the work items required under the Contract, which Dunn approved.

16.     The sequence of work contained within the original Schedule was established to ensure a logical and efficient sequence of work for the overall Project and to ensure that the Owner's existing facilities could remain in operation, which was a requirement of the Contract.

17.     Under the original Schedule, the excavation and underground piping installation for the Headworks Building and Vertical Loop Reactor ("VLR") were scheduled to be performed between September 15, 2015, and October 15, 2015.

18.     GMM commenced work in accordance with the approved Schedule in September 2015, but by October 22, 2015, it issued a Schedule Update that indicated excavation and underground piping at the Headworks/VLR area would be complete by November 9, 2015.

19.     However, soon after excavations in this area were complete, Dunn issued a letter to GMM dated November 11, 2015, in which it stated that on November 5, 2015, its "Resident Project Representative" notified Dunn that "soft soil, which may be problematic for construction, had been encountered in the area of the proposed headworks."

20.     Dunn indicated in its November 11, 2015, letter that it had AGI review the condition on November 9, 2015, and AGI determined that the soil in question was "sensitive sand" that, if kept dry during construction, would have adequate bearing capacity.

21.     GMM responded with its letter of November 16, 2015, to Dunn in which it clarified that:  (a) the soil was not problematic for construction; (b) GMM could build the structures on the subsoil as they existed; (c) GMM was not claiming a 'changed condition"; and (d) GMM did not believe that it could use a 10 ton roller as specified by Dunn to check for

bearing capacity (because the soil was too soft), and so requested that Dunn utilize some other method of checking bearing capacity to allow for the placement of the mud mat so that work could continue.

22. Dunn did not address GMM's concern that the only specified means of checking bearing capacity – a 10 ton roller – could not be used on the site.

23. As a result of the position of Dunn, GMM was precluded from proceeding with its work on the Headworks Building and Vertical Loop Reactor as of November 11, 2015.

24. In an effort to resolve this work stoppage caused by Dunn, and based, in part, on discussions between the interested parties, GMM proposed that it would proceed with the removal and replacement of the soil in the VLR and Headworks area that Dunn found to be unacceptable and replace it with rock fill based upon certain terms, including additional compensation and a time extension.

25. The proposal made by GMM was made as an accommodation to the Owner in an effort to resolve the suspension of the work caused by Dunn's refusal to allow placement of the mud mat and follow-on construction, and/or Dunn's failure to create an initial design that properly accounted for the subsurface conditions known to exist in this area of the Project.

26. The Owner, through Dunn, did not accept GMM's proposal, but rather, responded with numerous "conditions of acceptance."

27. The conditions of acceptance enumerated by the Owner, through Dunn, exceeded any requirements of the Contract owed by GMM and were not acceptable to GMM. The actions of the Owner, through Dunn, in rejecting GMM's proposal and insisting upon these "conditions of acceptance" further delayed the Project.

28.     The Owner, through Dunn, sought additional input from AGI, which issued an addendum dated February 19, 2016, to their October 7, 2011, geotechnical report specifically addressed to the Headworks and VLR areas.  Among other conclusions, AGI recommended that the work in this area only be conducted in the summer months and that exposed subgrade materials be stabilized with Portland cement.  AGI also confirmed its recommendation that soil bearing capacity be 2,000 psf but made no mention of how that could be determined – completely ignoring its 2011 recommendation that a 15 ton vibratory roller be used.

29.     In addition to on-site testing and evaluation from AGI, the Owner also retained Schnabel Engineering, LLC ("SEL"), to provide geotechnical engineering services.  Specifically, SEL was retained to review the reports already prepared by AGI, visit the Project site, form opinions about the existing soils and groundwater conditions, and make recommendations for dewatering, drainage, and stabilization of the soils in the VLR area.

30.     SEL issued its own Report on March 30, 2016, and concluded, among other things, that vibratory rollers should not be used on the subgrade. SEL also opined that performing the excavation in the winter was a "major contributor" to the difficulties encountered in preparing the site for construction.

31.     In March 2016 Dunn directed that GMM install three inches (3") of #57 aggregate on the VLR soils area and test using the 10 ton roller on static mode.  That experiment indicated that the soils continued to exhibit movement consistent with testing in November 2015, when the delay began.

32.     Notwithstanding that the testing in March 2016 indicated continued soils movement and soil moisture content consistent with that found in 2011 and November 2015, the Owner, through Dunn, then directed GMM to proceed with the placement of the mud mat and

aggregate layer as originally specified to allow for the construction of foundations and structures in the Headworks and VLR area.

33.     The soils conditions at the time that the Owner, through Dunn, directed the work to proceed in March 2016 were virtually identical to the soils conditions at the time that the Owner stopped the work in November 2015 and at the time that Dunn designed the Project and prepared the Contract Documents.

34.     The delay in the ability of GMM to perform the scheduled work in the Headworks and VLR areas between November 9, 2015, and March 17, 2016, was caused solely by Dunn's directives to stop work based on soil conditions that existed at the time of design of the Project, combined with the refusal and/or inability to direct the means to test the bearing capacity of the soil once it was determined that Dunn's original specification of a 10 ton vibratory roller was not possible.

35.     In addition to Dunn's inability to make necessary determinations and /or its errors in preparing the original design and testing protocol, Dunn also refused to approve remedial work methods proposed by GMM that would have cured these deficiencies because this additional work would have entitled GMM to additional compensation.

36.     These failures and deficiencies by the Owner and Dunn impacted the overall Project schedule and GMM's costs of performance.

37.     The work of GMM includes the placement of reinforced concrete as part of the construction of the VLR and related structures (in general, the "Concrete Work").

38.     As with all other parts of GMM's work, the design and specifications for the Concrete Work were prepared by Dunn and are contained within the Contract.

39.     One of the design elements prepared by Dunn relative to the concrete was the establishment of parameters of the mix design for the concrete.

40.     Specifically, the Specifications contain directives regarding the acceptable water to cement ratio to be used to achieve certain compressive strengths.

41.     Beginning in January 2016, GMM began placement of reinforced concrete for the floors and walls of the VLR.

42.     Thereafter, cracking within these areas of concrete became evident and, according to Dunn, cylinder breaks were evidencing strengths well beyond the specified 28-day strength, which Dunn claimed could be indicative that the concrete mix had been changed from the approved mix design.

43.     Based primarily on these issues, the Owner, upon the recommendation of Dunn, issued a "Stop Work Order" to GMM on February 12, 2016 with respect to additional reinforced concrete.

44.     The concrete placed that served as the basis for the "Stop Work Order" was mixed in accordance with the requirements of the Specifications.

45.     The issuance of the "Stop Work Order" delayed the critical path of the work.

46.     In response to the "Stop Work Order," GMM was forced to retain outside experts to examine the concrete mix and related Specifications.

47.     With the assistance of these outside experts, GMM determined that the cracking in the concrete was non-structural and was almost certainly as a result of a water to cement ratio

that was too low, especially given the fact that the areas of concern were considered "mass" concrete.

48.     GMM responded in writing to the "Stop Work Order" with its letters of February 22, 2016, and February 23, 2016, explaining the problems with the Specifications and providing notice that GMM would look to the Owner to recover costs associated with this stoppage in work.

49.     Without modifying the specified mix ratio, the Owner lifted the "Stop Work Order" on March 9, 2016, and permitted GMM to continue concrete placement.

50.     The initial concrete pours after the "Stop Work Order" was lifted also exhibited micro-cracks, all of which were determined to be non-structural.

51.     Finally, on April 8, 2016, Dunn issued correspondence directing GMM to provide a 3500 psi air entrained concrete mix with integral waterproofing containing a (water to cement) W/C ratio of 0.45 instead of the 0.40 mix, and that mix was approved by Dunn for all remaining pours.

52.     The "Stop Work Order" remained in effect for twenty six (26) calendar days and impacted the overall Project schedule and GMM's costs of performance.

53.     In addition, in or around March 2016, GMM encountered differing site conditions during operations to bore underneath railroad tracks.

54.     As a result, GMM incurred significant addition costs beyond those contemplated in the unit pricing set forth in the Contract.

55.     The Owner has refused to compensate GMM for the additional costs incurred as a result of all of the foregoing issues.

## COUNT I – BREACH OF CONTRACT

56.     GMM incorporates paragraphs 1 through 55 of this Complaint by reference as if fully set forth herein.

57.     The Owner has materially breached the Contract as described more fully above.

58.     The Owner, including through the actions and inactions of its representative, Dunn, hindered, interfered with and delayed GMM's performance of work by, *inter alia*, (a) failing to provide a design that adequately addressed and accounted for the known subsurface soil conditions; (b) issuing Contract Documents that contained soil testing requirements that were impossible to implement given the known subsurface soil conditions; (c) failing and/or refusing to make decisions and/or provide directives necessary to allow the work in the Headworks and VLR areas to proceed, (d) failing to provide a concrete mix specification that adequately addressed and accounted for the mass concrete utilized in Dunn's design;  (e) improperly issuing the "Stop Work Order" when all concrete work had been performed in accordance with the Contract Documents, (f) failing to have the Project site and necessary permits in place to begin Work; (g) failing to properly process applications for payment, including retainage; (h) failing to review and respond to submittals in a manner customary in the industry and in a manner resulting in delay to the Work of GMM; (i) late issuance of necessary design drawings, including for the work adjacent to the Headworks area of the Project; and (j) administering the Contract in an arbitrary manner, all of which resulted in substantial delay to the overall Project schedule and significant damages to GMM.

59.     As a direct and proximate result of the various breaches of its obligations under the Contract by the Owner, GMM was:

(a)     deprived of the work schedule originally contemplated under the Contract;

(b)     prevented from performing its work in an orderly, efficient, expeditious, and economical manner;

(c)     forced to perform part of the work under job conditions adversely affecting its labor productivity;

(d)     forced to perform work out of sequence and without continuous access to work areas;

(e)     forced to incur more labor costs than anticipated to accelerate work in an effort to recover from delays;

(f)     forced to incur more equipment and overhead costs than anticipated in an effort to recover from delays; and

(g)     prevented from realizing the profits it originally contemplated for the affected work under the Contract.

60.     The Owner's breaches have caused GMM to incur monetary damages and to perform over an extended period of time.

61.     GMM has satisfied all conditions precedent necessary to pursue this claim for "Breach of Contract" against the Owner.

62.     The amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest and costs.

WHEREFORE, Plaintiff, G.M. McCrossin, Inc., demands judgment in its favor and against the City of Ronceverte, West Virginia, in an amount in excess of $75,000.00, together with all pre-judgment and post-judgment interest and all costs and such additional relief as deemed just and equitable by this Court.

## COUNT II – UNJUST ENRICHMENT

### (In the alternative)

63.     Paragraphs 1 through 62 are incorporated herein by reference as though fully set forth.

64.     GMM provided all labor, materials, equipment, and services as set forth herein as necessary for the construction of the Project.

65.     GMM has conferred a benefit upon the Owner.

66.     GMM has not been compensated for the reasonable and/or fair value of the labor, materials, equipment, and services provided to the benefit of the Owner.

67.     Under the circumstances as set forth herein, it would be inequitable for the Owner to retain the benefit of the labor, materials, equipment, and services provided by GMM without payment therefore.

WHEREFORE, Plaintiff, G.M. McCrossin, Inc., demands judgment in its favor and against the City of Ronceverte, West Virginia, in an amount in excess of $75,000.00, together with all pre-judgment and post-judgment interest and all costs and such additional relief as deemed just and equitable by this Court.

**JURY TRIAL DEMANDED**.

Dated:  September 8, 2017                    Respectfully submitted,


                                            /s/ Mychal S. Schulz
                                            Mychal S. Schulz, Esquire (WVSB #6092)
                                            Kurt F. Fernsler, Esquire (WVSB #7444)
                                            BABST, CALLAND, CLEMENTS AND ZOMNIR, P.C.
                                            300 Summers Street, Suite 1000
                                            Charleston, WV 25301
                                            681-205-8888
                                            681-205-8814 fax
                                            mschulz@babstcalland.com
                                            kfernsler@babstcalland.com